UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| KAREN MCINNIS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff | ) |  |
|  | ) |  |
| v. | ) | No. 1:16-cv-00483-NT |
|  | ) |  |
| NANCY A. BERRYHILL, | ) |  |
| *Acting Commissioner of Social Security*,[1] | ) |  |
|  | ) |  |
| Defendant | ) |  |

### *RECOMMENDED DECISION ON MOTION FOR REMAND AND STATEMENT OF ERRORS*

Following briefing by the parties on the plaintiff's appeal of an administrative law judge's ("ALJ's") denial of her applications for Social Security Disability ("SSD") and Supplemental Security Income ("SSI") benefits, *see* Itemized Statement of Errors ("Statement of Errors") (ECF No. 15); Defendant's Opposition to Plaintiff's Statement of Errors (ECF No. 17), the plaintiff filed a motion for remand on the separate basis that new and material evidence called the decision into question, *see* Motion for Order Remanding Commissioner's Decision Under Sentence 6 of 42 U.S.C. § 405(G) ("Motion") (ECF No. 20). Following accelerated briefing on the Motion, *see* ECF Nos. 21-22, I heard oral argument on both the Motion and the appeal. For the reasons that follow, I conclude that the case should be remanded for reconsideration of new and material evidence. Hence, I recommend that the court grant the Motion and deem the Statement of Errors moot.

---

[1] Nancy A. Berryhill, who is now the Acting Commissioner of Social Security, is substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d).

1

## I. Discussion

### A. Procedural History

The plaintiff filed applications for SSD and SSI benefits on January 11, 2013, and April 22, 2013, respectively, alleging that she suffered from several physical and mental impairments that rendered her disabled as of June 9, 2012. *See* Record at 11, 14. The plaintiff's claims were denied initially, and on reconsideration. *See id.* She requested a hearing, which was held before an ALJ on November 24, 2015. *See id*. at 11, 28. Both the plaintiff and a vocational expert ("VE") testified. *See id*. at 28-29. On January 8, 2016, the ALJ rendered a decision finding that the plaintiff had not been disabled within the meaning of the Social Security Act at any time from her alleged onset date, June 9, 2012, through the date of the decision. *See* Finding 11, *id*. at 22.

The ALJ deemed the plaintiff's physical impairments nonsevere but found that she had severe mental impairments of generalized anxiety disorder and bipolar disorder. *See* Finding 3, *id.* at 14. He concluded that she retained the residual functional capacity ("RFC") to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to carry out simple and moderately complex tasks in a normal schedule; the claimant is able to interact appropriately with co-workers and supervisors, and deal effectively with the public on an occasional basis; and the claimant is able to adapt to a moderate degree of workplace changes in the course of a normal workday and workweek.

Finding 5, *id.* at 16.

With the benefit of the vocational testimony, the ALJ determined that the plaintiff remained capable of performing the representative jobs of price marker, mail sorter, and electrical assembler, which existed in significant numbers in the national economy, and, therefore, was not disabled. *See id*. at 22. The Appeals Council declined to review the decision, *see id*. at 1-3, making the decision the final determination of the commissioner, *see* 20 C.F.R. §§ 404.981, 416.1481.

## B. The Case Before the ALJ

The case before the ALJ was marked by three separate periods: the period from the plaintiff's alleged onset date of disability, June 9, 2012, through August 2014, when she was committed to the care of Riverview Psychiatric Center ("Riverview") in Augusta, Maine, after having been found incompetent to stand trial on minor criminal charges on June 18, 2014; the period of her psychiatric hospitalization, ending with her discharge from inpatient care at Riverview on December 8, 2014; and, finally, the period from her discharge until the date of the ALJ's decision, January 8, 2016.

During the pre-Riverview period, the plaintiff failed to attend a series of consultative examinations required as part of her disability claim from September through November 2013. *See* Record at 72. Accordingly, on November 14, 2013, agency nonexamining consultant Brian Stahl, Ph.D., found that there was insufficient evidence to decide her claim. *See id*.

The plaintiff had begun receiving treatment in March 2011 from psychiatric nurse practitioner ("NP") Debra Ort, who diagnosed her at intake with bipolar affective disorder. *See id.* at 377, 380. In May 2011, NP Ort noted that the plaintiff was hypomanic. *See id.* at 387. On August 12, 2013, NP Ort completed a questionnaire in which she indicated that many of the plaintiff's work-related mental abilities were markedly limited and that her limitations were such that she could not engage in full-time work "without regression in stability." *Id.* at 417-18.

In May 2014, the plaintiff attended a consultative examination with agency examining consultant James R. Werrbach, Ph.D. *See id.* at 405. The plaintiff told Dr. Werrbach that her disability stemmed from her physical and emotional issues. *See id.* at 406. Dr. Werrbach found, *inter alia*, that the plaintiff had an intact memory, exhibited the ability to concentrate and answer his questions for the most part, that her speech was pressured but of normal volume and fluency, and that, for the most part, she had a sequential, clear, and coherent thought process. *See id.* at

408. He diagnosed her with post-traumatic stress disorder, panic disorder with agoraphobia, and dysthymic disorder. *See id.* at 409.

Dr. Werrbach stated that "[i]t would appear" that the plaintiff "would be able to do a work-related activity such as understanding[,]" "would have some difficulties doing work-related activities such as memory, sustained concentration, and persistence," but not to the extent that it would be "impossible for her to do these tasks[,]" and "is able to socially interact with others and adapt to new social situations even though she does suffer from a panic disorder with resulting agoraphobia." *Id*.

With the benefit of review of the Werrbach report, agency nonexamining consultant Thomas Knox, Ph.D., completed a mental RFC assessment on May 13, 2014, in which he indicated that the plaintiff could carry out simple and moderately complex tasks in a normal schedule, interact appropriately with coworkers and supervisors on a fulltime schedule, deal effectively with the public on an occasional basis, and adapt to a moderate degree of workplace changes in the course of a normal workday/workweek. *See id*. at 94-96.

On June 18, 2014, the plaintiff was found incompetent to stand trial by the Maine Superior Court in Penobscot County following what she testified was an arrest for stealing milk, which caused her to have "a nervous breakdown." *Id*. at 17, 47. Following her admission to Riverview in August 2014, the plaintiff was treated by Robert A. Riley, Ph.D., a clinical neuropsychologist, and Physician's Assistant ("PA") Zachary D. Smith, PA-C. *See id*. at 430-38, 488-502.

On September 15, 2014, Dr. Riley noted that the plaintiff "continued with very pressured speech and disorganized thinking[,]" believing there to be a conspiracy against her between her lawyer, the judge presiding over her case, the district attorney prosecuting it, and her boyfriend. *Id*. at 436-38. On October 1, 2014, PA Smith noted that she "clearly remains quite hypomanic"

4

and diagnosed her with bipolar disorder. *See id*. at 421, 425. On October 22, 2014, Dr. Riley indicated that the plaintiff was improving and "appearing near her baseline[.]" *Id.* at 434. She had a more normal rate of speech, with generally well-organized and coherent thoughts. *See id.* The plaintiff continued to improve and was released on December 8, 2014. *See id*. at 419. At discharge, Stephen Moran, M.D., a treating physician at Riverview, diagnosed her with bipolar affective disorder, most recent episode manic with psychotic features, currently in remission on medications. *See id.* at 419-20.

After her discharge, the plaintiff continued outpatient treatment with PA Smith. *See id*. at 488-502. On December 22, 2014, he noted that her basic cognitive functioning was intact, she had coherent thought processes but with loose associations, tangentiality, and flight of ideas, and she was still hypomanic. *See id*. at 489. On January 20, 2015, he found that she had an increase in her symptoms and was "hypomanic to manic with pressured and intrusive speech . . . and mild thought disorganization." *Id.* at 497. He suspected that she might not be complying with her prescribed pharmacological regime and noted that she "would benefit from a more aggressive mood stabilizing regimen that she is unfortunately not willing to accept at this time." *Id.*

On March 17, 2015, PA Smith again found the plaintiff to be hypomanic and stated that, while she was having trouble finding work, he did "not believe that she could succeed in any position at this time." *Id.* at 495. On April 14, 2015, he found her "quite disorganized/tangential in conversation[,]" continuing to "fixate on her previous legal charges," which she was unaware were more serious than she believed, and "too disorganized to be receptive to an explanation since her arrest." *Id.* at 493. PA Smith continued to note during May 12 and June 9, 2015, visits that the plaintiff was hypomanic and would benefit from changes in her medication that she continued to resist. *See id*. at 488-89, 491-92. Nonetheless, he noted that, during the plaintiff's June 9, 2015,

5

visit, he had suggested to her that "being unemployable because of a felony conviction does not qualify her for disability coverage and that her pursuit of a job indicates to me that she is able to work." *Id.* at 488.

On September 29, 2015, PA Smith completed a medical source statement of the plaintiff's ability to do mental work-related activities, as well as a separate mental RFC assessment. *See id*. at 452-58. In his medical source statement, PA Smith checked boxes indicating that she was markedly limited in, or effectively precluded from, maintaining attention and concentration sufficient to perform tasks throughout an eight-hour workday, working in coordination with or proximity to others without being distracted by them, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. *See id*. at 452-53. He explained that the plaintiff's bipolar illness was inadequately treated and that symptoms of distractibility would persist. *See id*. at 453.

In his mental RFC assessment, PA Smith checked boxes indicating that the plaintiff was seriously limited in, but not precluded from, maintaining attention for a two-hour segment, working in coordination with or proximity to others without being unduly distracted, and getting along with coworkers and peers without distracting them or exhibiting behavioral extremes. *See id*. at 456. He stated, "A more appropriate medication regimen is available, but she has refused to consider any changes – doing so would likely improve her symptoms substantially and possibly resolve her difficulty with attention." *Id*.

The ALJ found that, "[o]verall, . . . the medical evidence of record supports . . . that the [plaintiff] retains the capacity to perform, at least, a limited range of simple work." *Id.* at 18. In summarizing the plaintiff's longitudinal history, he noted that, upon her discharge from Riverview on December 8, 2014, Dr. Moran "diagnosed her with bipolar affective disorder in remission at

6

that time" and that, "[t]hereafter, outpatient treatment notes continued to document improvement in symptoms and functioning." *Id*. at 18.

The ALJ listed other factors that, in his view, cut against a finding for the plaintiff. *See id*. at 18-19. He noted, for example, that she refused to consider the insistent suggestions of PA Smith that she try medication changes that would help her condition, stating, "This steadfast refusal to consider alternative treatment methods belies the [plaintiff's] dire allegations." *Id*. He further noted, *inter alia*, that the plaintiff was applying for work and volunteer positions by early 2015, that PA Smith had indicated that her largest barrier to employment was her criminal record, and that the plaintiff had told Dr. Werrbach that her physical impairments were the primary reason she was unable to work. *See id*. at 19. In total, he concluded, her allegations were "not wholly credible." *Id.*

The ALJ then considered the opinion evidence, giving (i) great weight to the opinions of the agency nonexamining consultants (among them, Drs. Stahl and Knox), which he deemed generally consistent with the medical evidence as a whole, including "Dr. Werrbach's benign findings," Dr. Riley's Riverview discharge report, and PA Smith's 2015 treatment notes, (ii) partial weight to the Werrbach opinion to the extent consistent with his mental RFC determination, (iii) partial weight to the Smith mental RFC assessment to the extent that PA Smith indicated that the plaintiff's mental impairments did not preclude work-like activities and made findings consistent with the ALJ's mental RFC determination, (iv) no weight to the opinion of NP Ort on the grounds, *inter alia*, that, while the plaintiff did have "severe mental impairments, there is no justification for the degrees of limitation" that NP Ort assessed, and "her assessment [was] inconsistent with the medical evidence of record as a whole[,]" and (v) no weight to PA Smith's medical source statement or his March 17, 2015, statement in a treatment note that the plaintiff

7

could not succeed at any position, which the ALJ deemed inconsistent with other evidence, including PA Smith's mental RFC assessment and his notation in a June 9, 2015, treatment note that the plaintiff could work. *Id*. at 19-20. He further noted that PA Smith's March 17, 2015, opinion was a "one-time 'snapshot' of the [plaintiff's] current functioning, which is inconsistent with his statement three months later that [she] was capable of working." *Id*. at 20.

### C. The New Evidence

#### 1. Standards for a "Sentence Six" Remand

Sentence six of 42 U.S.C. § 405(g) provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]

42 U.S.C. § 405(g).

Typically, a request for a sentence six remand concerns "new evidence . . . tendered after the ALJ decision." *Mills v. Apfel,* 244 F.3d 1, 5 (1st Cir. 2001) (citation and internal quotation marks omitted). Sentence six allows for a "pre-judgment remand" and obviates a ruling on the existing administrative decision based on the existence of good cause for remanding for further evidentiary proceedings. *See, e.g.*, *Seavey v. Barnhart,* 276 F.3d 1, 13 (1st Cir. 2001); *Freeman v. Barnhart,* 274 F.3d 606, 610 (1st Cir. 2001).

On a cautionary level, the First Circuit has observed that "Congress plainly intended that remands for good cause should be few and far between, that a yo-yo effect be avoided — to the end that the process not bog down and unduly impede the timely resolution of social security appeals." *Evangelista v. Secretary of Health & Human Servs.,* 826 F.2d 136, 141 (1st Cir. 1987). Thus, prejudgment remand is only appropriate where there is good cause for the claimant's failure

to introduce the evidence at the administrative hearing and the evidence in question is new and "material," as in "necessary to develop the facts of the case fully[.]" *Id.* at 139.

New evidence of an infirmity or impairment is not automatically material. The party seeking remand must show that the evidence is not merely cumulative and that consideration of the evidence is essential to a fair hearing, *see id.*; in other words, that the earlier decision "might reasonably have been different" had the evidence been considered by the commissioner, *id.* at 140 (citation and internal quotation marks omitted). There is a temporal concern, as well. The evidence must be material to the issue of "the claimant's condition during the time period for which benefits were denied[,]" as opposed to the development of a new disability. *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir. 1988).

## 2. Discussion

The plaintiff proffers three exhibits documenting that, for the period from September 8, 2016, through October 6, 2016, she was hospitalized at Pen Bay Medical Center ("Pen Bay") for psychiatric inpatient treatment stemming from her bipolar condition. *See* Exh. A (ECF No. 20-1) to Motion at Page ID # 590. She includes records from the period preceding that hospitalization, *see, e.g.,* Exh. B (ECF No. 20-2) to Motion at Page ID ## 597-611, as well as from the period postdating it, *see, e.g.*, Exh. C (ECF No. 20-3) to Motion at Page ID ## 711-19.

The commissioner concedes that, with the exception of one record dated December 4, 2015, the proffered evidence is "new" and noncumulative and that, because it did not then exist, the plaintiff had "good cause" for failing to provide it to the ALJ. *See* Defendant's Opposition to Plaintiff's Motion for Remand Under Sentence Six of 42 U.S.C. § 405(g) ("Opposition") (ECF No. 21) at 3 & n.1.

9

However, she contests its materiality, asserting that the plaintiff fails to demonstrate that the new evidence has any bearing on her ability to function on or before January 8, 2016, the date of the ALJ's decision. *See id*. at 4 (quoting *Beliveau ex rel. Beliveau v. Apfel*, 154 F. Supp.2d 89, 95 (D. Mass. 2001), for the proposition that "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of . . . the subsequent deterioration of the previous non-disabling condition") (internal quotation marks omitted). She asserts that, rather than seek a remand, a claimant who believes her condition has worsened should file a new claim. *See id*.

Nonetheless, in the unusual circumstances of this case, I am persuaded that the new evidence does bear on the plaintiff's ability to function on or before January 8, 2016, and that the ALJ's decision "might reasonably have been different" had that evidence been available. *Evangelista*, 826 F.2d at 141 (citation and internal quotation marks omitted).

It is apparent that the ALJ found that the plaintiff had stabilized, with her bipolar disorder in remission, after her period of involuntary commitment. In so doing, he found consistencies in assessments of her condition across the first and third time periods at issue that made her time at Riverview appear to be an aberration, rather than a looming threat of a recurrence of bipolar symptoms severe enough to warrant inpatient psychiatric hospitalization.

The plaintiff's new evidence reveals that, on September 8, 2016, less than nine months after the ALJ's decision, the plaintiff was admitted to Pen Bay for psychiatric inpatient treatment to address her bipolar condition and remained hospitalized there for nearly a month, until October 6, 2016. *See* Exh. A at Page ID # 590. She was admitted for suicidal thoughts, arrived in a manic state, and was refusing medication. *See id*. at Page ID ## 590, 595-96. Although she denied the

condition to the nurse practitioner assisting her, she was diagnosed with bipolar disorder type 1, presently manic. *See id*. at Page ID # 595.

The records also reveal that, during the period after June 2015, when PA Smith's treatment notes stop, the plaintiff continued to struggle with bipolar symptoms. On June 23, 2016, she saw Peter Millard, M.D., who diagnosed her with bipolar affective disorder, "currently manic, moderate[,]" and described her as a "high need . . . patient who requires long-term psychiatric followup." Exh. C at Page ID # 715.

On July 18, 2016, the plaintiff was screened by Mental Health Rehabilitation Technician ("MHRT") Nicholas Cullen as part of an application for case management services. *See* Exh. B at Page ID ## 700-01.[2] MHRT Cullen continued to assist her before, during, and after her Pen Bay hospitalization. *See, e.g., id*. at Page ID ## 597-98, 614-15, 632-33. She also received psychiatric treatment from Nurse Practitioner ("NP") Steven Keene, N.P., as part of her care plan. *See, e.g., id*. at Page ID ## 706-09.

On July 26 and 27, 2016, the plaintiff presented as manic, but days later, by August 1 and 4, was friendly and conversational. *See id.* at Page ID ## 597, 704-10. Four days later, on August 8, 2016, she again presented as manic, and while being transported to a clinic by MHRT Cullen, become so agitated that he warned her that he would have to call a support person or the police to transport her if she did not calm down. *See id*. at Page ID # 599. Reports from August 22 and 30, 2016, show improvement in her condition, *see id*. at Page ID ## 604, 608, but on September 8, 2016, she had what appeared to be a panic attack, *see id*. at Page ID # 612. MHRT Cullen took her to the hospital, noting that "[s]he clearly is unable to adequately take care of herself in this

---

[2] A Mental Health Rehabilitation Technician is an "[u]nlicensed assistive person . . . who by virtue of employment has direct access to and provides direct care or direct contact assistance with activities of daily living or other services to individuals in residential care facilities, hospitals and other health care and direct access services settings." 22 M.R.S.A. § 1812-J(1)(D).

11

state." *Id.* Her hospitalization at Pen Bay began that day. *See id*. at Page ID # 590. Following her discharge, she was able to find an apartment and look for work; however, she continued to struggle with her medications and had again become manic by December 2016. *See id.* at Page ID ## 626-82.

On November 30, 2016, for example, the plaintiff's case management meeting abruptly ended when she became too upset to continue, presenting as "upset, irritable," and demonstrating an "inability to be redirected[.]" *Id*. at Page ID # 661. Her case manager was to consult with her supervisor and psychiatrist "due to concerns over presentation today and the possibility of it being linked to med changes as the client has been refusing her Geodon." *Id*. Her case manager facilitated a team meeting on December 2, 2016, during which there were "concerns that the [plaintiff] may need a higher level of care as she is struggling to work on goals." *Id*. at Page ID # 663. The team devised a plan that included "explor[ing] guardianship" with the plaintiff. *Id*.

On December 16, 2016, the plaintiff was brought to see NP Keene by her case manager, who expressed concerns that she had ceased taking Geodon and was intermittently refusing to take Lithium. *See id*. at Page # 675. NP Keene's efforts to persuade the plaintiff to continue to take Geodon failed. *See id*. She refused, expressing great concern over a weight gain of nearly 50 pounds in a month, although she did agree to continue a dosage of Lithium at bedtime. *See id*. In a follow-up note dated December 19, 2016, NP Keene indicated that the plaintiff had been "found standing at the reception desk in a highly agitated state, which appeared to be of a manic nature." *Id*. at Page ID # 680. NP Keene noted that, although the plaintiff had no scheduled appointment, he met with her and her case manager to express his concern that she continued to refuse to take Geodon and was requesting a decrease in her Lithium dosage. *See id*. The plaintiff refused to restart Geodon, stating that she did not want to "get fat." *Id*. (internal quotation marks omitted).

12

The plaintiff argues, *inter alia*, that the ALJ "did not appreciate that [her] bipolar condition wax[ed] and waned, which the lengthy hospital admission in 2016 confirms." Motion at [3]. I agree.

As the plaintiff points out, *see* Reply in Support of Motion To Remand Under Sentence 6 ("Reply") (ECF No. 22) at 12-13, the commissioner has recognized the importance of consideration of patterns of exacerbation and remission in mental impairments. Effective January 17, 2017, she revised section 12.00 (mental disorders) of the so-called "Listings," Appendix 1 to 20 C.F.R. Part 404, Subpart P, to provide:

> 4. How we evaluate mental disorders involving exacerbations and remissions.
>
> a. When we evaluate the effects of your mental disorder, we will consider how often you have exacerbations and remissions, how long they last, what causes your mental disorder to worsen or improve, and any other relevant information. We will assess any limitation of the affected paragraph B area(s) of mental functioning using the rating scale for the paragraph B criteria. We will consider whether you can use the area of mental functioning on a regular and continuing basis (8 hours a day, 5 days a week, or an equivalent work schedule). We will not find that you are able to work solely because you have a period(s) of improvement (remission), or that you are disabled solely because you have a period of worsening (exacerbation), of your mental disorder.
>
> b. If you have a mental disorder involving exacerbations and remissions, you may be able to use the four areas of mental functioning to work for a few weeks or months. Recurrence or worsening of symptoms and signs, however, can interfere enough to render you unable to sustain the work.

Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66165 (Sept. 26, 2016) (codified at Listing 12.00(F)(4)).

As the plaintiff notes, *see* Reply at 13, the version of Listing 12.00 in effect at the time the ALJ rendered his decision also stated that "symptoms and signs may be intermittent or continuous depending on the nature of the [mental] disorder" and directed that adjudicators "project the

probable duration of [a mental] impairment(s)." Listing 12.00(B) & (D) (version in effect Jan. 8, 2016).

At oral argument, counsel for the commissioner contested that the ALJ's decision turned on a finding that the plaintiff's bipolar disorder was in remission, noting that the ALJ did not so state. *See* Record at 14-21. Yet, given the significance of the plaintiff's 2014 Riverview hospitalization, both in the severity of the condition and the time spent hospitalized, he assumedly relied on Dr. Moran's discharge diagnosis that the condition was in remission (which he noted, *see id*. at 18) to have judged her capable of engaging in even unskilled work. His RFC and Step 5 findings suggest that he concluded that the plaintiff's period of hospitalization was an aberration and that her true baseline was as reflected in Drs. Werrbach's and Knox's pre-hospitalization opinions, Drs. Riley's and Moran's findings on discharge, and some, if not all, of PA Smith's findings in treating her following her discharge.

The plaintiff has now introduced evidence that calls that conclusion into question for the period at issue. The unstable, manic behavior observed by MHRT Cullen from July 18 to September 8, 2016, the second month-long period of hospitalization at Pen Bay, and the plaintiff's return to a manic condition by December 2016 call into question whether she had stabilized to the point that she could engage in even unskilled work on a sustained basis following her Riverview discharge. Thus, there is a reasonable possibility that the new evidence would have influenced the ALJ's decision had it been available to him. *See Monjaras v. Colvin*, Civil Action No. H-12-2689, 2013 WL 5945642, at *3-*5 (S.D. Tex. Nov. 6, 2013) (granting a sentence six remand when ALJ's decision finding claimant not disabled turned on whether claimant's cancer was in remission, and evidence dated nearly six months after decision showed that the cancer had returned). Should the court agree that a sentence six remand is warranted, the question of whether the new evidence is

in fact outcome-determinative is for the ALJ to decide on the basis of the totality of the evidence, old and new.[3]

## II. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the plaintiff's motion for a sentence six remand, vacating the ALJ's decision and remanding this case for further proceedings consistent herewith, and **DEEM** her statement of errors **MOOT**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 25th day of June, 2017.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[3] The plaintiff's failures to follow prescribed treatment do not, standing alone, render remand for further proceedings an empty exercise. Before drawing a negative inference about an individual's symptoms and their functional effects, an adjudicator must "first consider[] any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Social Security Ruling 96-7p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2016) ("SSR 96-7p"), at 140. In a similar vein, if a claimant is found disabled, benefits are denied if he or she has failed, "without a good reason," to follow prescribed treatment that "is expected to restore [his or her] ability to work[.]" 20 C.F.R. §§ 404.1530, 416.930.